IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM SULLIVAN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 17 C 1307 |
| v. | Judge Harry D. Leinenweber |
| ALL WEB LEADS, INC., a Delaware Corporation, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Strike the Proposed Class [ECF Nos. 7, 12]. For the reasons stated herein, the Motion is denied.

## I.  FACTUAL BACKGROUND

Plaintiff William Sullivan ("Sullivan") filed this lawsuit under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (the "TCPA"), to address allegedly deceptive marketing practices of Defendant All Web Leads, Inc. ("All Web"). The following facts are drawn from Sullivan's Complaint and are, for purposes of this Motion, accepted as true, with all inferences drawn in his favor. *See, e.g., Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2015).

All Web offers services to insurance industry customers, typically insurance agents, by generating "leads." Specifically, All Web places calls to potential purchasers of insurance coverage and then transfers those calls to its customers. (Compl. ¶ 16.) To identify "leads," All Web owns and operates various websites claiming to offer insurance quotes. (*Id.* ¶ 18.) Upon visiting one of these websites, a consumer is directed to fill out a quote request form specific to the type of insurance of interest. (*Ibid.*) Sullivan was one such consumer. On January 13, 2017, he visited *www.affordable-health-insurance-plans.org* to obtain quotes on health insurance plans that would comply with the Patient Protection and Affordable Care Act, 52 U.S.C. § 18001 *et seq.* ("Obamacare"). (*Id.* ¶¶ 31, 37-38.) When prompted (see figure below), Sullivan entered his zip code and clicked "Start Now."



(Compl. ¶¶ 19, 32.)  Once directed to the next page, Sullivan filled out the form (reproduced below) by entering personal information, including a "Day phone" number, and then clicked the "Submit" button.



(*Id.* ¶ 20.) Because it appeared in small print at the bottom of the page, Sullivan did not see All Web's consent language before he clicked "Submit":



By clicking "Submit" I provide my signature, expressly authorizing up to eight <u>insurance companies or their agents or partner companies</u>, including GoHealth, to contact me at the number and address provided with insurance quotes or to obtain additional information for such purpose, via live, prerecorded or autodialed calls, text messages or email. I understand that my signature is not a condition of purchasing any property, goods or services and that I may revoke my consent at any time.

(*Id.* ¶ 23.)  He therefore had no reason to suspect that he was agreeing to be contacted via autodialed calls.  (*Id.* ¶ 26.)

Soon after completing the quote form, Sullivan received an autodialed call from a representative at All Web. (Compl. ¶ 34.) Upon answering, Sullivan heard "an immediate pause on the other end, followed by a distinct 'clicking' noise before the connection with the representative was made." (*Id.* ¶ 35.)  The representative asked Sullivan a series of questions, confirmed that he was seeking information about health insurance, and then transferred him to a health insurance agent. (*Id.* ¶ 36.) Sullivan informed the agent that he was seeking a health insurance plan that would comply with the Obamacare individual mandate; yet the agent attempted to persuade Sullivan "to enroll in a limited benefit non-major medical plan, and suggested that it was a better option than an 'Obamacare-compliant' plan." (*Id.* ¶ 38.)  When it became clear that the agent was not offering the opportunity to review and compare "Obamacare-compliant" health insurance quotes, Sullivan ended the call. (*Ibid.*)  He continued to receive additional similar phone calls over the next several days. (*Id.* ¶ 40.)

Sullivan filed this lawsuit seeking injunctive relief and money damages on behalf of himself and a nationwide class of individuals who utilized the same website, clicked "Submit" on

the associated quote form, and then received autodialed calls. (Compl. ¶ 42.)

## II.  THE TELEPHONE CONSUMER PROTECTION ACT

The TCPA makes it unlawful for any "person within the United States" to, *inter alia*, "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or . . . artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(A)(iii). (The exception to this prohibition - calls "made solely to collect a debt owed to or guaranteed by the United States" - is a non-issue here.)  The TCPA authorizes the Federal Communications Commission (the "FCC") to promulgate regulations implementing the statute's requirements.  47 U.S.C. § 227(b)(2); *see also, Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 370 (2012) ("The Act . . . directs the Federal Communications Commission (FCC or Commission) to prescribe implementing regulations."); *accord, Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682, 687 (7th Cir. 2013).

Under the express language of the TCPA, an automated call may be lawfully made to a cell phone in certain circumstances, only one of which is relevant to this case.  Specifically, a

call is not unlawful if it is made "with the prior express consent of the called party." 47 U.S.C. § 227(b)(A)(iii). The FCC recognizes that the statute itself is mute on what form of express consent – oral, written, or some other kind – suffices "for calls that use an automatic telephone dialing system or prerecorded voice to deliver a telemarketing message." *In the Matter of Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1838 ¶ 21 (Feb. 15, 2012) (hereinafter, the "2012 Order").

At one time, FCC implementing regulations required only "prior express consent" for automated calls to cell phones, meaning that a person had only to "knowingly release their phone number [to the caller] . . . absent instructions to the contrary." 2012 Order at 1833 ¶ 7 n.20 (citation omitted). In 2012, however, the FCC announced a new rule to take effect on October 16, 2013, that modified the consent requirements for automated telemarketing calls under the TCPA. *See,* 2012 Order at 1831 ¶ 1; 47 C.F.R. § 64.1200. The new rule for automated telemarketing calls to cell phones requires the "prior express written consent of the called party." 47 C.F.R. § 64.1200(a)(2). The FCC defines "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or

services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). Prior express written consent means:

> an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or marketing messages to be delivered.

47 C.F.R. § 64.1200(f)(8). To be effective, such consent also must satisfy further requirements:

> (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that: (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property goods, or services.
>
> (ii) The term "signature" shall include an electronic or digital form signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

*Ibid.* In tandem with elevating these consent requirements, the FCC also promulgated certain exceptions. As relevant, it created an exemption from the prior express written consent requirement for health care messages made to cellular lines. That exception states that no person or entity may:

> (2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or

> constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, *other than . . . a call that delivers a "health care" message made by, or on behalf of a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103*[.]

47 C.F.R. § 64.1200(a)(2) (emphasis added). Despite some ambiguity in the wording of this "health care rule" (the parties' shorthand), the FCC has clarified that such calls are exempted only from the *written* consent requirement. *See, Consumer & Governmental Aff. Bureau Seeks Comment on Petition for Expedited Declaratory Ruling & Exemption from Am. Ass'n of Healthcare Admin. Mgmt.,* 29 F.C.C. Rcd. 15267, 15267 n.7 (Dec. 17, 2014); *cf. Jackson v. Safeway, Inc.,* No. 15 C 4419, 2016 WL 5907917, at *7 n.10 (N.D. Cal. Oct. 11, 2016) ("[B]oth parties assume that there is a 'prior express consent' requirement for such 'health care' calls.").

The "health care rule" speaks in HIPAA-defined terms and, as with most administrative alphabet soup, requires further explication. Under the Health Insurance Portability and Accountability Act ("HIPAA"), "health care" is defined as "care, services, or supplies related to the health of an individual," including, but not limited to, "(1) [p]reventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care,

and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body; and (2) [s]ale or dispensing of a drug, device, equipment, or other item in accordance with a prescription." 45 C.F.R. § 160.103.

Last to mention is this lawsuit's bedrock. Section 227 of the TCPA "authorizes private litigation"; aggrieved parties need not depend on the FCC. *Holtzman,* 728 F.3d at 688; *accord, Mims,* 565 U.S. at 370. In general, a district court presiding over such litigation gives controlling weight to final decisions of the FCC implementing and interpreting the TCPA. *See, e.g., CE Design, Ltd. v. Prism Bus. Media, Inc.,* 606 F.3d 443, 449-50 (7th Cir. 2010) (noting that "Congress vested the power of agency review of final FCC orders exclusively in the courts of appeals"); *Jamison v. First Credit Servs., Inc.,* 290 F.R.D. 92, 97 (N.D. Ill. 2013) (stating in a TCPA case that the court is "bound by the FCC's orders, which are final and controlling").

### III.  ANALYSIS

All Web seeks to dismiss Sullivan's Complaint under Fᴇᴅ. R. Cɪᴠ. P. 12(b)(6) for failure to state a claim on which relief can be granted.  In the alternative, All Web moves to strike the

class allegations in the Complaint for failure to satisfy the strictures of FED. R. CIV. P. 23.

## A.  Motion to Dismiss

Based on a mélange of arguments, All Web moves to dismiss. The gravamen of its Motion is that Sullivan has pled himself out of court because the Complaint establishes his prior express consent or, alternatively, his prior express *written* consent to receive the call(s).  Sullivan responds that All Web's Motion is bankrupt because its website, as alleged, does not procure valid express written consent.

### *1. Legal Standard*

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must state a claim that is plausible on its face." *Adams,* 742 F.3d at 728 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim enjoys "facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Adams,* 742 F.3d at 728 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).  A plaintiff must allege that all elements of his claim are satisfied, but cannot survive a Rule 12(b)(6) motion to dismiss by alleging only legal conclusions. *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1147 (7th Cir. 2010).  "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

To state a claim under the TCPA, Sullivan must allege that: (1) a call was made (2) using an automatic telephone dialing system or artificial or prerecorded voice; (3) the number called was assigned to cellular telephone service; and (4) the party making the call lacked the requisite consent. *See, e.g., Thrasher-Lyon v. Illinois Farmers Ins. Co.,* 861 F.Supp.2d 898, 904-05 (N.D. Ill. 2012).

### 2. Discussion

At the outset, Sullivan objects to treating the issue of consent at the pleading stage. (*See,* ECF No. 10 ("Pl.'s Response") at 6-7.) The prevailing view in this district is that "prior express consent" under the TCPA "is an affirmative defense on which the defendant bears the burden of proof; it is not a required element of the plaintiff's claim." *Kolinek v. Walgreen Co.,* No. 13 C 4806, 2014 WL 518174, at *2 (N.D. Ill. Feb. 10, 2014) (collecting cases). Because complaints need not anticipate and defeat affirmative defenses, dismissal is typically only appropriate if the affirmative defense "is set out entirely in the plaintiff's complaint." *Ibid.* For this reason, courts reject a TCPA defendant's attempt on a Rule 12(b)(6) motion to argue consent contrary to express

allegations in a complaint or attack a complaint for not pleading lack of consent. *See, e.g., Charvat v. Allstate Corp.,* 29 F.Supp.3d 1147, 1149 (N.D. Ill. 2014); *Thrasher-Lyon,* 861 F.Supp.2d at 905; *Greene v. DirecTV, Inc.,* No. 10 C 117, 2010 WL 1506730, at *2 (N.D. Ill. Apr. 14, 2010). In more garden-variety circumstances, the Court would end the inquiry without engaging in a detailed consent analysis, because it is clear enough that Sullivan has alleged sufficient facts to alert All Web of the substance of his TCPA claim. *See, e.g., Bakov v. Consolidated Travel Holdings Grp., Inc.,* No. 15 C 2980, 2016 WL 4146471, at *3 (N.D. Ill. Aug. 4, 2016) (Leinenweber, J.) (finding that the plaintiffs sufficiently alleged that "they received unsolicited phone calls on their cell phones that were prerecorded," which "is all that is necessary" for a TCPA claim).

However, All Web's Motion is at least formally premised on the allegations of (illegitimate) consent contained within the four corners of the Complaint. All Web does not attack the Complaint for failure to plead lack of consent. Nor does it speculate contrary to the facts of the Complaint, instead arguing only their legal significance. *See, e.g., U.S. v. Lewis,* 411 F.3d 838, 842 (7th Cir. 2005) ("The exception occurs where, as here, the allegations of the complaint itself set

forth everything necessary to satisfy the affirmative defense. . . .").  Alas, because the argument here is that Plaintiff's own consent allegations plead him out of court, the Court excavates the consent issue before denying All Web's Motion.

    *a.  The Calls at Issue Fall outside the "Health Care" Rule*

    If the "health care rule" applies in this case, then All Web needed only Sullivan's prior express consent to autodial his cell phone.  To qualify for the less demanding consent requirements of the "health care rule," an automated call must deliver a "health care message."  All Web contends that the autodialed calls at issue qualify as "health care messages" because Sullivan was seeking "more affordable health insurance" and the calls were part of securing "supplies related to the health of an individual."  (ECF No. 12 ("Def.'s Mot.") at 10.)

    Although it abjures comprehensively defining "health care message," the FCC describes such calls as those placed by or on behalf of "the consumer's health care provider to the consumer . . . concern[ing] the consumer's health."  2012 Order at 1855 ¶ 63.  Archetypical messages include "immunization reminders," *ibid.*, "prescription notifications," *In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991,* 30 F.C.C. Rcd. 7961, 8031 ¶ 146 (July 18, 2015)

(hereinafter the "2015 Order"), and flu shot notices. *See,
e.g., Zani v. Rite Aid Headquarters Corp.,* No. 14 C 9701, 2017
WL 1383969, at *9-12 (S.D.N.Y. Mar. 30, 2017); *Jackson v.
Safeway, Inc.,* No. 15 C 4419, 2016 WL 5907917, at *8-9 (N.D.
Cal. Oct. 11, 2016). Guidance from the FCC and the limited case
law on point establish the relevance of three factors to whether
a call conveys a "health care message":

> First, if such a call concerns a product or service
> that is inarguably health-related, . . . it likely
> conveys a health care message. Such category would
> include the administration of medication "prescribed
> by a doctor or other healthcare provider," *but would
> not include any product simply because it may be
> construed to benefit a consumer's health.* Second, if
> such a call is made by or on behalf of a health care
> provider to a patient with whom she has an established
> health care treatment relationship, that too is
> material to application of the rule. Finally, if the
> call concerns the individual health care needs of the
> patient recipient, that too is material. The
> operative question as to this last factor would be
> whether a nexus exists between the subject matter of
> the call and the established health care needs of its
> recipient.

*Zani*, 2017 WL 1383969, at *11 (emphasis added) (internal
citations omitted).

Applying these factors to this case leads inescapably to
the conclusion that All Web's lead-generating calls are not
"health care messages." First, such calls are not "inarguably
health-related"; rather, they smack of messages designed to
promote a "product simply because it may be construed to benefit

- 15 -

a consumer's health." As the *Zani* court indicated, such subject matter is not as a matter of law "inarguably health-related."

Second, All Web does not autodial consumers "by or on behalf of a health care provider" in the course of an "established health care treatment relationship." All Web's calls neither remind patients who had a flu shot last year to come into the same pharmacy to receive this year's flu shot, nor confirm provision of medication to an individual "in accordance with a prescription." *See, Zani,* 2017 WL 1383969, at 11; *Jackson,* 2016 WL 5907917, at *8-9; 45 C.F.R. § 160.103; 2012 Order at 1855 ¶ 63 (noting that "immunization reminders" and calls "'pushing' flu vaccines" may convey health care messages). Instead, All Web's calls represent an effort to inaugurate a new relationship between an individual and a health insurance *issuer*.

Finally, there is no nexus between the subject matter of an All Web autodialed call as alleged "and the established health care needs of its recipient." Recall that HIPAA defines "health care" in non-limiting fashion to include preventative, diagnostic, or therapeutic services "with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body" and medications or devices "dispensed in accordance with a

prescription." 45 C.F.R. § 160.103. All Web's calls are hopelessly divorced from these examples of "health care." Indeed, a footnote in the FCC's 2015 Order confirms that "insurance-coverage calls" – even *where the insurer actually had a relationship with the insured* and was calling to notify a patient that coverage was available for a medical service *already rendered* – do not necessarily fall within the HIPAA definition of "health care." *See,* 2015 Order at 8028-39 ¶ 141 n.473 ("We note, additionally, that insurance-coverage calls, which are included in AAHAM's list of 'healthcare calls,' are not necessarily among the topics in HIPAA's definition of 'health care.'"); *In the Matter of American Association of Healthcare Administrative Management Petition for Expedited Declaratory Rulings and Exemption Regarding Non-Telemarketing Healthcare Calls,* CG Dkt. No. 02-278, at 3 (Oct. 21, 2014).

While All Web is correct in the narrow sense that, under these cases and FCC guidance, calls otherwise qualifying as "health care messages" need not eschew all advertising content, it has not shown how Sullivan's Complaint establishes the antecedent issue of the alleged calls' health care content. As such, for purposes of its Motion, All Web cannot rely on the TCPA's prior express consent requirement under the "health care rule."

b.   *All Web Needed, but Did Not as a Matter of*
     *Law Effectively Procure, Sullivan's*
     *Prior Express Written Consent*

All Web argues in the alternative that Sullivan's complaint does not adequately allege "telemarketing" calls triggering the heightened written consent requirement and that, even if it does, Sullivan pleads himself out of court by establishing that All Web had his prior express written consent.

All Web fails to show how its alleged calls to consumers like Sullivan constitute anything other than telemarketing calls. As set forth in its implementing regulations, the TCPA defines "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). That is, whether a call is a "telemarketing" call depends not on its content but instead on its purpose. *See, Golan v. Veritas Entertainment, LLC,* 788 F.3d 814, 820 (8th Cir. 2015); *see also, Payton v. Kale Realty, LLC,* No. 13 C 8002, 164 F.Supp.3d 1050, 1062-63 (N.D. Ill. Feb. 22, 2016). In this case, Sullivan alleges that All Web's purpose in placing these calls is to encourage the purchase of insurance from All Web's insurance industry customers. (Compl. ¶¶ 16-18, 21, 31, 36-38.) And, as set forth above, no content of these alleged calls falls within

- 18 -

the ambit of the "health care rule." As such, Sullivan has adequately pled that All Web called him for telemarketing purposes. *See, e.g., Margulis v. Eagle Health Advisors, LLC,* No. 4:15 C 1248, 2016 WL 1258640, at *3 (E.D. Mo. Mar. 31, 2016) (denying motion to dismiss the plaintiff's claim, which adequately pled that the defendant used a "telemarketing robot" to place calls to him for the purpose of selling health insurance). All Web therefore needed Sullivan's prior express written consent.

The parties vigorously dispute whether Sullivan's Complaint establishes that he gave All Web his prior express written consent to make the calls. All Web claims that the consent language on the quote form webpage, coupled with the user's choice to click the "Submit" button, constitutes prior express written consent under the TCPA. Sullivan responds that this method of procuring consent is legally insufficient.

The Court feels that the legal enforceability of All Web's consent language is an issue best left for later in the litigation when there is a fully developed factual record. In ruling on All Web's Motion to Dismiss, however, the Court must determine whether Sullivan states a plausible TCPA violation based on lack of (effective) prior express written consent, with inferences drawn in his favor. The Court finds it plausible on

the facts alleged that All Web did not effectively procure Sullivan's consent. This is because the Complaint does not as a matter of law establish reasonable notice of the terms to which Sullivan purportedly gave prior express written consent, let alone a disclosure that was "clear and conspicuous" under the TCPA. 47 C.F.R. § 64.1200(f)(8)(i); *id.* 64.1200(f)(3) ("The term **clear and conspicuous** means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures.") (emphasis in original).

Sullivan unequivocally alleges not only that he lacked *actual* notice of All Web's consent language, but also that these disclosures were unreasonably camouflaged in the context of the webpage and below its "Submit" button. Given that *at least* reasonable notice to the consumer is required, consider how courts in contract cases analyze the reasonableness of notice of terms to online consumers. (Also note that the definition of "prior express written consent" relies on the concept of a "written agreement" and, at least in part, expressly incorporates contract law. *See,* 47 C.F.R. § 64.1200(f)(8)(ii) ("to the extent that such form of signature is recognized as a valid signature under . . . state contract law").) Regardless of whether All Web's consent agreement is characterized as a

"clickwrap" or a "browsewrap" agreement, contract law only permits its enforcement if there was reasonable notice of its terms plus some action capable of being construed as assent. The following cases establish this proposition and provide salient data points:

- *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1177 (9th Cir. 2014) (invaliding a browsewrap agreement, *i.e.,* a "Terms of Use" hyperlink placed directly below or a few inches away from the button users had to click to proceed with checkout, because the website did not provide any notice to users or promote any affirmative action to demonstrate their assent to the agreement);

- *Hancock v. Am. Tel. & Telegraph Co., Inc.,* 701 F.3d 1248, 1256 (10th Cir. 2012) (enforcing a clickwrap agreement whose terms were displayed in a scrollable text box and underneath it were buttons labeled "Exit Registration," "I Reject," and "I Agree");

- *Specht v. Netscape Communications Corp.,* 306 F.3d 17, 32 (2d Cir. 2002) (Sotomayor, J.) (refusing to enforce an agreement whose terms were placed below the "Accept" button);

- *Sgouros v. TransUnion Corp.,* No. 14 C 1850, 2015 WL 507584, at *6-7 (N.D. Ill. Feb. 5, 2015) ("It is unreasonable to expect users to scroll down the Window when they are not aware of a possibility of being bound by the terms in the Window.");

- *Van Tassell v. United Marketing Group, LLC,* 795 F.Supp.2d 770, 790 (N.D. Ill. 2011) (invalidating a browsewrap agreement because the webpage failed to have any reference to the Conditions of Use and also required a multi-step process to locate the Conditions of Use);

- *Burcham v. Expedia, Inc.,* No. 4:07 C 1963, 2009 WL 586513, at *1, 3 (E.D. Mo. Mar. 6, 2009) (finding a valid clickwrap agreement where a "Continue" button led to a page that stated "By continuing on you agree to the following terms

and conditions," provided the terms and conditions, and included a clickable box stating "I agree to the terms and conditions"); and

- *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D. Pa. 2007) (finding reasonable notice of a clickwrap agreement where users did not need to scroll down to a submerged screen to see the terms, and "a prominent admonition in boldface to read the terms and conditions . . . and indicate assent" made the text of the agreement immediately visible to users).

In this case, after Sullivan input his personal information, he clicked the "Submit" button immediately below the end of the health insurance quote form without scrolling down further to the bottom of the webpage to read All Web's Lilliputian consent language. In these circumstances, the Court thinks it "reasonable for users to assume that their click merely constituted their assent to [an] authorization" submitting their personal information further to getting a health insurance quote. *Sgouros,* 2015 WL 507584 at *5. By clicking "Submit," users would likely expect quotes to be displayed on an ensuing webpage once their information was processed, especially in light of the website's promises of *speedy* quotes. (*See, e.g.,* Compl. ¶¶ 19 ("The Fastest Way to Get On & Off Exchange Quotes."), 20 ("The Fastest Way to Get Free Health Insurance Quotes.").) Given the website's silence on quotes proceeding by phone and failure to alert users that legal disclosures appear below the "Submit" box, the Court

cannot, while drawing inferences in Sullivan's favor, find that All Web's alleged consent mechanism gave Sullivan reasonable notice sufficient for an enforceable written "agreement" – to say nothing of the TCPA's heightened "clear and conspicuous" disclosure requirement governing prior express written consent agreements. Thus, All Web has not made a legal showing based on the complaint's allegations that it effectively procured Sullivan's prior express written consent.

Presented with no other basis for dismissing Sullivan's complaint, the Court denies All Web's Rule 12(b)(6) Motion to Dismiss.

## B. Motion to Strike Proposed Class

In his Complaint, Sullivan proposes the following class definition:

> All persons within the United States who filled out and submitted an insurance quote form on Defendant's website www.affordable-health-insurance-plans.org and then received a non-emergency telephone call from All Web Leads, or any party acting on its behalf, to a cellular telephone through the use of an automated telephone dialing system or an artificial or prerecorded voice.

(Compl. ¶¶ 45, 49.) The Complaint goes on to exclude from the class All Web, any entities in which it has a controlling interest, its agents and employees, the Court and its staff, and all claims for personal injury, wrongful death, and emotional distress. (*Id.* ¶ 46.) Although he cannot pinpoint the exact

number of putative class members, Sullivan asserts that they total in the thousands and can be identified through call records maintained by All Web. (*Id.* ¶¶ 47, 52.) Finally, he identifies several common questions of law and fact, such as whether All Web uses an automatic telephone dialing system to make non-emergency calls to class members' cell phones; whether All Web gives proper notice to those who fill out a quote form that it intends to place calls using an automatic dialing system to the phone numbers provided; whether the website's requirement that users consent to receive phone calls via the use of an autodialer as a condition to provision of services violates FCC rulings; and whether All Web can meet its burden of showing prior express written consent to make such calls. (*Id.* ¶¶ 53-55.)

As an alternative to its Motion to Dismiss, All Web argues that the Court should strike the proposed class for failure to comply with the requirements of FED. R. CIV. P. 23(a) and FED. R. CIV. P. 23(b)(3). (All Web does not claim that the proposed class is insufficiently ascertainable, which is an independent class certification requirement.) Courts generally address class certification at the pleading stage "only when the class allegations are facially and inherently deficient." *Machowicz v. Kaspersky Lab, Inc.,* No. 14 C 1394, 2014 WL 4683258, at *5

(N.D. Ill. Sept. 19, 2014) (internal quotation marks omitted).
The problem for All Web is that Sullivan's class allegations are
not facially or inherently deficient.

The nub of All Web's typicality, commonality, adequacy, and
predominance arguments is that Sullivan seeks impermissibly to
represent putative class members regardless of the form of their
consent. (*See,* Def.'s Mot. at 18-20; ECF No. 17 ("Def.'s
Reply") at 8-10.) In a similar vein, All Web contends that the
common issue of "whether Defendant gave proper notice to users"
who filled out the quote form "cannot be resolved without a
series of mini-trials." (Def.'s Reply at 10.) All Web grounds
its argument in *Cholly v. Uptain Grp., Inc.,* No. 15 C 5030, 2017
WL 449176 (N.D. Ill. Feb. 1, 2017). There, the court struck the
plaintiff's class allegations on typicality grounds because she
sought to "represent a class of persons who received calls from
Uptain where Uptain did not have express consent," whereas her
individual claim was "based only on telephone calls made to her
cellular phone *after she had expressly revoked her consent*." *Id.*
at *3 (emphasis added). Thus, the plaintiff's class in *Cholly*
was facially deficient under Rule 23(a)(2).

Plainly, this is not the case here. Sullivan seeks to
represent a class of individuals each of whom engaged in the
same consent procedure that he did – filling out the quote form,

clicking "Submit," and then receiving an autodialed cell phone call. Thus, absent some other interface with All Web, each putative class member gave the same consent; the ability of All Web to invoke consent as an affirmative defense to each class member is uniform; and determining the legal efficacy of this consent under the TCPA "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011); *Holtzman,* 728 F.3d at 684 ("Class certification is normal in litigation under § 227, because the main questions . . . are common to all recipients."). All Web therefore fails to identify any facial deficiency in Sullivan's proposed class.

Even if Sullivan's class definition conceptually includes those consumers who gave All Web some sort of individualized consent, it would be premature at this pre-discovery procedural stage to determine whether this suit can proceed as a class action. "Courts determine whether issues of individualized consent defeat commonality and predominance in a TCPA [case] on a case-by-case basis after evaluating the specific evidence available to prove consent." *Buonomo v. Optimum Outcomes, Inc.,* 301 F.R.D. 292, 298 (N.D. Ill. 2014) ("Optimum, however, fails to present any specific evidence — as opposed to mere speculation — that this purportedly individualized issue

predominates over common issues. Nor can it given that Optimum has refused to provide any class discovery while its motion to strike is pending."). Indeed, many of the cases All Web invokes were denials of class certification based on evidence obtained through discovery. *See, e.g., Jamison,* 290 F.R.D. at 107 (finding that individualized consent issues predominated because the defendant "set[] forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone"); *Quality Mgmt. and Consult. Servs., Inc. v. SAR Orland Food, Inc.,* No. 11 C 6791, 2013 WL 5835915 (N.D. Ill. Oct. 30, 2013) (holding that the plaintiff failed to meet its burden on class certification to introduce evidence showing that the defendant's consent defense as to the representative plaintiff applied to the class as a whole); *Vigus v. Southern Illinois Riverboat/Casino Cruises, Inc.,* 274 F.R.D. 229, 235 (S.D. Ill. 2011) ("[T]he Casino has provided evidence that at least three telephone numbers identified using Vigus' culling process did *not* indicate reassigned numbers.") (emphasis in original). These cases furnish no support for All Web's motion to strike Sullivan's proposed class before discovery has commenced.

*Kasalo v. Harris & Harris, Ltd.,* 656 F.3d 557 (7th Cir. 2011), is not to the contrary. The authorization granted there

to deny class certification "even before the plaintiff files a motion requesting certification" rested on the truism that the court "need not delay a ruling on certification if it thinks that *additional* discovery would not be useful in resolving the class determination." *Id.* at 563 (emphasis added) (citations omitted). Here, as mentioned above, this action can on its face be maintained on a class basis, and discovery – which has not occurred yet – may assist both parties in arguing the propriety of certification. Because All Web's arguments do not clarify why the proposed class is conceptually deficient, "discovery is needed to determine whether a class should be certified." *Santiago v. RadioShack Corp.,* No. 11 C 3508, 2012 WL 934524, at *4 (N.D. Ill. Feb. 10, 2012). Striking the class allegations would be premature.

In a final gambit, All Web points to language in Sullivan's Complaint that he was "tricked" into providing his cell phone number and clicking "Submit." This allegation of "trickery," All Web claims, amounts to a fraud claim necessitating mini-trials into whether each putative class member was deceived. Simply put, this argument strains credulity. Sullivan's only claims on behalf of the class are under the TCPA, and his belief that he was "tricked" seems merely an individual variation on the Complaint's objective theme that All Web's consent procedure

is ineffective and unenforceable. Even if Sullivan had *actually* meant to plead a claim for fraud, this would not necessarily furnish grounds for striking all the class allegations prior to discovery. *See, e.g., Volling v. Antioch Rescue Squad,* 999 F.Supp.2d 991, 1006 (N.D. Ill. 2013) (noting that "there is no penalty for invoking the wrong [legal theory], or using the wrong name to identify a theory," and that it would be "premature to strike" the legal theories presented in different counts "before discovery reveals the appropriate theory").

The Court therefore denies All Web's Motion to Strike as premature in light of the absence of any class discovery.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court denies Defendant's Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Strike the Complaint's Class Allegations [ECF Nos. 7, 12].

**IT IS SO ORDERED.**

_____
          Harry D. Leinenweber, Judge
          United States District Court

Dated: 6/1/2017

- 29 -