## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOHN KARPILOVSKY and JIMMIE CRIOLLO, JR., *individually and on behalf of all others similarly situated*, | Case No. 1:17-cv-01307 |
| Plaintiff | Hon. Harry D. Leinenweber |
| v. | |
| ALL WEB LEADS, INC., a Delaware corporation, | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    BACKGROUND ................................................................................ 2

    A.    The TCPA Broadly Prohibits Automated Calls to Cell Phones. ........................... 2

    B.    Common Evidence Establishes AWL's Automated Call Practices. ..................... 3

        1.    AWL's Business Model ................................................................ 3

        2.    The "Affordable Health Insurance Plans" Website ................................ 4

        3.    The Automatic Dialing System Used to Call Each Class Member .......... 6

        4.    Calls to Class Members ................................................................ 6

    C.    Common Evidence Demonstrates that AWL Knew of Its TCPA Violations. ................................................................ 7

        1.    Attorneys General Complaints and Investigations ................................ 7

        2.    AWL's Lack of TCPA Compliance ................................................ 9

    D.    Common Evidence Shows an Absence of Prior Express Written Consent. .......... 9

    E.    Background of Plaintiffs' Claims ................................................ 12

        1.    Plaintiff Jimmie Criollo ................................................................ 12

        2.    Plaintiff John Karpilovsky ................................................................ 13

III.    LEGAL STANDARD ................................................................ 14

IV.    ARGUMENT ................................................................ 15

    A.    The Proposed Class ................................................................ 15

    B.    Plaintiffs Have Standing. ................................................................ 15

    C.    The Proposed Class Is Ascertainable. ................................................ 16

    D.    The Requirements of Rule 23(a) Are Met. ........................................ 17

        1.    The Class Is Sufficiently Numerous. ................................................ 17

        2.    The Proposed Class Involves Common Issues of Law and Fact. ............ 17

        3.    Plaintiffs' Claims Are Typical. ................................................ 19

        4.    Plaintiffs and their Counsel Are Adequate. ...................................... 20

    E.    The Rule 23(b)(3) Requirements Are Satisfied. ................................ 20

        1.    Common Issues Predominate. ................................................ 21

        2.    A Class Action Is Superior to any Alternatives. .............................. 23

V.    APPOINTMENT OF CLASS COUNSEL ................................ 25

VI.    CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alea London Ltd. v. Am. Home Servs., Inc.*,
 638 F.3d 768 (11th Cir. 2011) ................................................................................................ 2

*Amchem Prod., Inc. v. Windsor*,
 521 U.S. 591 (1997) ................................................................................................... 14, 21

*Barrera v. Guaranteed Rate, Inc.*,
 Case No. 17-cv-5668, 2017 WL 4837597 (N.D. Ill. Oct. 23, 2017) ........................ 16

*Bee, Denning, Inc. v. Capital Alliance Group*,
 310 F.R.D. 614 (S.D. Cal. 2015) .............................................................................. 24

*Birchmeier v. Caribbean Cruise Line, Inc.*,
 302 F.R.D. 240 (N.D. Ill. 2014) ........................................................................ passim

*Boundas v. Abercrombie & Fitch Stores, Inc.*,
 280 F.R.D. 408 (N.D. Ill. 2012) ............................................................................... 16

*Butler v. Sears, Roebuck & Co.*,
 727 F.3d 796 (7th Cir. 2013) .............................................................................. 15, 21

*Carriuolo v. Gen. Motors Co.*,
 823 F.3d 977 (11th Cir. 2016) ............................................................................ 18, 19

*Chapman v. Wagener Equities, Inc.*,
 No. 09 C 07299, 2014 WL 540250 (N.D. Ill. Feb. 11, 2014),
 *appeal denied* 747 F.3d 489 (7th Cir. 2014) ...................................................... 1, 14

*Cheney v. Cyberguard Corp.*,
 213 F.R.D. 484 (S.D. Fla. 2003) .............................................................................. 18

*Cicilline v. Jewel Food Stores, Inc.*,
 542 F. Supp. 2d 831 (N.D. Ill. 2008) ....................................................................... 23

*Ervin v. OS Restaurant Servs., Inc.*,
 632 F.3d 971 (7th Cir. 2011) .................................................................................... 14

*Frydman v. Portfolio Recovery Associates*, LLC,
 No. 11 CV 524, 2011 WL 2560221 (N.D. Ill. Jun. 28, 2011) ................................... 6

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
 No. 07 C 5953, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009) .................................. 18

*Gehrich v. Chase Bank USA, N.A.*,
 316 F.R.D. 215 (N.D. Ill. 2016) ............................................................................... 17

*Gulf Oil Co. v. Bernard*,
 452 U.S. 89 (1981) ................................................................................................... 14

*Hinman v. M and M Rental Center*,
 545 F. Supp. 2d 802 (N.D. Ill. 2008) ................................................................. 19, 23

*Indiana Bell Tel. Co. v. McCarty*,
 362 F.3d 378 (7th Cir. 2004) ...................................................................................... 2

*Ira Holtzman, C.P.A. v. Turza*,
  728 F.3d 682 (7th Cir. 2013) ................................................................. 1, 14

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) ..................................................................... 19

*Kleen Products LLC v. Int'l Paper*,
  306 F.R.D. 585 (N.D. Ill. 2015)............................................................. 14, 23

*Kohen v. Pacific Inv. Mgmt. Co., LLC*,
  571 F.3d 672 (7th Cir. 2009) ..................................................................... 15

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
  289 F.R.D. 674 (S.D. Fla. 2013)................................................................. 14

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ............................................................... 15, 23

*Mims v. Arrow Fin. Servs. LLC*,
  132 S. Ct. 740 (2012) .................................................................................. 2

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ..................................................... 15, 16, 24

*Muro v. Target Corp.*,
  580 F.3d 485 (7th Cir. 2009) ..................................................................... 19

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) ..................................................................... 19

*Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*,
  254 F. Supp. 3d 1007 (N.D. Ill. 2017) ...................................................... 17

*Pierre v. Midland Credit Mgmt., Inc.*,
  Case No. 16 C 2895, 2017 WL 1427070 (N.D. Ill. Apr. 21, 2017)................... passim

*Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*,
  281 F.R.D. 327 (E.D. Wis. 2012) .............................................................. 23

*Savanna Group, Inc. v. Trynex, Inc.*,
  No. 10–cv–7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013) .................... 17, 19, 20

*Spates v. Roadrunner Transp. Sys., Inc.*,
  Case No. 15 C 8723, 2016 WL 7426134 (N.D. Ill. Dec. 23, 2016) ................. 19

*Sullivan v. All Web Leads, Inc.*,
  No. 17 C 1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017) ....................... passim

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ....................................................... 1, 17, 18, 21

**Statutes**

28 U.S.C. § 2342.......................................................................................... 2

**Rules**

Fed. R. Civ. P. 23(a) ....................................................................... 14, 17, 19

Fed. R. Civ. P. 23(a)(1) .............................................................................. 17

Fed. R. Civ. P. 23(a)(2) .............................................................................. 18

Fed. R. Civ. P. 23(a)(3).............................................................................. 20

Fed. R. Civ. P. 23(a)(4)........................................................................................... 20

Fed. R. Civ. P. 23(b)(3)..................................................................................... passim

Fed. R. Civ. P. 23(g)(1)........................................................................................... 25

Fed. R. Civ. P. 30(b)(6)............................................................................................. 3

**Treatises**

Wright, *et al.*, 7A *Fed. Practice & Proc.* § 1751 (3d ed. 2010) ................................. 14

**Regulations**

105 Stat. 2394, §§ 10, 12, 14 ....................................................................................... 2

30 FCC Rcd. 7961, 30 F.C.C.R. 7961 (2015)............................................................... 3

*In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).............................................................................. 6

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, 23 FCC Rcd 559 (2008) ....... 6

1491314.4

## I.     <u>INTRODUCTION</u>

Plaintiffs respectfully file this memorandum in support of their motion to certify a class under Federal Rule of Civil Procedure 23 in this action for damages pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

The Seventh Circuit has held that "[c]lass certification is normal" in TCPA cases "because the main questions . . . are common to all recipients." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013). Here, Defendant All Web Leads, Inc. ("AWL") engaged in a uniform practice of making automated calls to class members' cell phones, and purported to obtain consent from all those it called in precisely the same way via uniform website language. Such a practice makes class certification appropriate—and even "the norm"—in TCPA cases. *See Chapman v. Wagener Equities, Inc.*, No. 09 C 07299, 2014 WL 540250, at *15, n. 11 (N.D. Ill. Feb. 11, 2014), *appeal denied* 747 F.3d 489 (7th Cir. 2014) (citing cases). Indeed, this Court already found that the central issue in this case—whether AWL obtained prior express consent to place autodialed telemarketing calls to class members as the TCPA requires—will be demonstrated with proof that is "uniform." *Sullivan v. All Web Leads, Inc.*, No. 17 C 1307, 2017 WL 2378079, at *9 (N.D. Ill. June 1, 2017) (Leinenweber, J.).

Put differently, either AWL had consent for every call it made to class members or it had it for none of them; there are no unique individualized issues relevant to that issue. That question—and the answer to it—will drive this litigation and permit the Court to efficiently resolve all class members' TCPA claims against AWL in one stroke. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). For these reasons, and as detailed below, Plaintiffs submit that this case is particularly well-suited for class certification, and respectfully request that the Court grant their motion.

## II.  BACKGROUND

### A.  The TCPA Broadly Prohibits Automated Calls to Cell Phones.

Congress enacted the TCPA to prevent autodialed calls by companies that escaped state invasion of privacy and nuisance statutes by operating interstate.  *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 745 (2012).  Congress made explicit Congressional Findings regarding its reasons for the TCPA.  105 Stat. 2394, §§ 10, 12, 14 (notes following 47 U.S.C. § 227).  *Mims* cited these Congressional Findings in noting that "'automated or prerecorded telephone calls' . . . were rightly regarded by recipients as 'an invasion of privacy.'" 132 S. Ct. at 745 (citing 105 Stat. 2394).  Accordingly, Congress found that "Banning such automated or prerecorded telephone calls … is the only effective means of protecting telephone consumers from this nuisance and privacy invasion."  105 Stat. 2394, § 12.

"Modern cell phones are not just another technological convenience.  With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'"  *Riley v. California*, 134 S. Ct. 2473, 2494-95 (2014) (citation omitted); *see also Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050 (7th Cir. 2013) (discussing "Congress's goal to protect the privacy of citizens against unsolicited telephone calls").  "The TCPA is essentially a strict liability statute."  *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) (citation omitted).

Congress vested the Federal Communication Commission ("FCC") with authority to issue regulations implementing the TCPA.  47 U.S.C. § 227(b)(2).  Under the Hobbs Act, 28 U.S.C. § 2342, all FCC rulings are binding on this Court because the Federal Courts of Appeals have exclusive jurisdiction over challenges to FCC rulings.  *Indiana Bell Tel. Co. v. McCarty*, 362 F.3d 378, 389 n.13 (7th Cir. 2004).  These regulations dictate that the burden is on the ***calling party***, i.e. the defendant, to demonstrate that it obtained the prior express consent of the

called party.  *See* 30 FCC Rcd. 7961, 30 F.C.C.R. 7961 (2015), at ¶ 47.  This Court already ruled that prior express consent is "an affirmative defense on which the defendant bears the burden of proof; it is not a required element of the plaintiff's claim."  *Sullivan*, 2017 WL 2378079, at *4 (citation omitted).

### B.    Common Evidence Establishes AWL's Automated Call Practices.

#### 1.    AWL's Business Model

AWL is a privately held lead generation company.  *See* https://www.gencap.com/companies/.[1]  It creates websites designed to harvest consumer information, and sells it to insurance companies.  *Id.* (AWL is a "customer acquisition marketing business that procures consumer leads through a variety of online channels – proprietary websites, third-party websites, and other aggregators – and then qualifies and packages those consumers as leads, clicks, and calls to its insurance industry customers"); *see also* Ex. A (AWL Karpilovsky 0064) (same).[2]  AWL's "customers" are therefore not the consumers who visit AWL's health, automobile, or homeowners' insurance websites.  *Id.*[3]  Rather, AWL derives its profits from the insurance agents, brokers, and companies that buy those consumers' information, known in the industry as "leads."  *See* Ex. B (Excerpts from Rule 30(b)(6) Deposition of Jessica Leirer) ("Leirer Dep.") at 26:6-16, 33:4-11; Ex. C (Excerpts from Rule 30(b)(6) Deposition of Darren Ginther) ("Ginther Dep.") at 24:2-3.

AWL's customers include "the top 20 U.S. property and casualty insurance carriers, most of the largest U.S. health insurers, and over 30,000 individual insurance agents and agencies in

---

[1] AWL is owned by a private equity firm with over $8.5 billion in assets.  *See* www.gencap.com/about/.

[2] All exhibit citations refer to exhibits attached to the Declaration of Jonathan D. Selbin, filed contemporaneously with this motion.

[3] *See also* http://www.allwebleads.com/about-our-insurance-leads (AWL "deliver[s] tens of thousands of . . . consumers to our customers every day" by "physically call[ing] tens of thousands of consumers every day . . . .") (accessed Jan. 8, 2018).

all 50 U.S. states." *See* http://goo.gl/jPGysr (accessed Jan. 8, 2018). It has 550 employees, including at least 450 call-center employees. Ex. B (Leirer Dep.) at 33:12-25. AWL's annual revenues are $110 million, according to a 2015 release. *See* http://goo.gl/bVdk16 (accessed Jan. 8, 2018). In 2015, AWL acquired InsuranceQuotes, the insurance division of Bankrate, a publicly traded company, for $165 million. *Id.*; *see also* Ex. D (AWL Karpilovsky 8354).

To harvest consumers' lead information, AWL creates and maintains websites designed to attract consumers who search for insurance-related keywords. Ex. B (Leirer Dep.) at 37:3-15; Ex. A (AWL Karpilovsky 0064-65). AWL pays to increase traffic to its websites. Ex. B (Leirer Dep.) at 37:3-15. AWL operates 35 such lead-generating websites and owns "several thousand" other websites that redirect consumers to AWL's 35 active websites. *Id.* at 35:7-10, 2-25. Around 600,000 consumers visit AWL's websites every month. *Id.* at 39:22-25, 40:4-6. This case involves only one AWL website, www.affordable-health-insurance-plans.org, which around 1,000 consumers visit every day. *Id.* at 41:5-8.

## 2. The "Affordable Health Insurance Plans" Website

AWL's website, www.affordable-health-insurance-plans.org, includes a "quote" form to "Get Free Health Insurance Quotes!" *See* https://quote.affordable-health-insurance-plans.org/HealthShort (hereinafter the "Website"). Sometime prior to 2011, AWL created the Website to harvest lead information to be sold to health insurance agents, brokers, and carriers. Ex. B (Leirer Dep.) at 41:2-4, 15-16. To "Get Free Health Insurance Quotes," consumers are required to enter their ZIP code and other personal information into the quote form and click "Submit," expecting to receive an online insurance quote. *See* http://www.allwebleads.com/faq ("How are the leads generated") (accessed Jan. 8, 2018); *see also* Ex. E (Excerpts from Oct. 2, 2017 Deposition of Jimmie Criollo) ("Criollo Dep.") at 99:3-21. However, after clicking "Submit," consumers are not presented with any online insurance quotes. Ex. B (Leirer Dep.) at

46:24 ("We don't directly provide quotes.").  Instead, they receive an immediate telephone call from AWL's autodialer, which connects to a call center employee who then attempts to sell the consumer's lead information to an insurance agent, broker, or carrier.  *Id.* at 33:4-25; Ex. A (AWL Karpilovsky 0064); Ex. E (Criollo Dep.) at 99:1-25 (explaining that he received a phone call but not an online quote); Ex. F (Excerpts from Oct. 16, 2017 Deposition of John Karpilovsky ("Karpilovsky Dep.") at 17:23-23:8.[4]  Unbeknown to consumers, hidden beneath the "Submit" button is Lilliputian language purporting to authorize AWL to make autodialed calls and to sell their information to eight AWL insurance customers.  Ex. E (Criollo Dep.) at 58:8-59:7; Ex. F (Karpilovsky Dep.) at 17:23-19:16, 103:23-104:1.

AWL's corporate representative testified that the Website has not changed in any material way since 2013.  Ex. B (Leirer Dep.) at 52:25-53:11 (noting that the Website remained the same except for the elimination of two irrelevant screening questions and a slight modification of the color scheme).  In addition, Plaintiffs' expert conducted an independent analysis and confirmed that, since 2013, the Website has remained the same and consumers who visited the Website engaged in the same procedure.  *See* Ex. G (December 1, 2017 Expert Report of Alexander Young) ("Young Rept.") at 1-3, 7-8, 16-17 (concluding after reviewing the Website's design "changelog" that "the Website was not modified in any material way" between Feb. 1, 2013 and July 25, 2017).  The Lilliputian language that appears below the "Submit" button has always appeared below the "Submit" button since the Website's creation.  Ex. B (Leirer Dep.) at 45:21-23; Ex. G (Young Rept.) at 8 (confirming that AWL's internal changelog was consistent with Ms. Leirer's testimony and "no changes affected the placement of the contested language below the 'Submit' button").

---

[4] *See also* http://www.allwebleads.com/about-our-insurance-leads ("Agents can often reach consumers while they're still sitting at the computer!"); http://www.allwebleads.com/insurance-leads-process.

### 3. The Automatic Dialing System Used to Call Each Class Member

AWL used two automatic telephone dialing systems ("autodialers," or "ATDSs") to call Plaintiffs and class members. Ex. C (Ginther Dep.) at 30:17-31:4, 75:1-76:2. Until 2016, AWL used a Five9 dialing system to call consumers who submitted information through the Website. *Id.* Five9 is a predictive dialer and, as such, is an autodialer. Ex. H (Dec. 1, 2017 Expert Report of Jeffrey A. Hansen) ("Hansen Rept.), ¶ 25; *see In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003); *see also Frydman v. Portfolio Recovery Associates*, LLC, No. 11 CV 524, 2011 WL 2560221, at *4 (N.D. Ill. Jun. 28, 2011) (noting that the FCC has on at least four occasions held that a predictive dialer meets the statutory definition of an ATDS). Since 2016, AWL has used a proprietary, in-house dialing system. *See* Ex. I (AWL's Responses to Plaintiffs' First Set of Interrogatories), No. 12. According to AWL's corporate representative, AWL's dialing system relies on an algorithm that "automatically" places calls to consumers who meet certain predetermined insurance criteria. Ex. C (Ginther Dep.) at 31:1-32:23, 45:1-46:4, 83:1-86:11. AWL's dialer uses a "binary process"; if AWL's algorithm determines that the consumer information "matches" AWL's criteria, the dialer automatically places a call. *Id.* at 88:12-16. This predictive dialer is also an autodialer. Ex. H (Hansen Rept.), ¶ 26; *see also, e.g.*, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, 23 FCC Rcd 559 (2008).

### 4. Calls to Class Members

Six days a week, AWL's two autodialers placed calls to class members that the autodialers connected to AWL's 450 call center employees. Ex. C (Ginther Dep.) at 88:1-9. AWL maintained outbound dialing lists from which it compiled a list of calls placed to telephone numbers obtained through the Website since February 2013. *Id.* at 70:3-17, 77:25-80:10. From

that list, Plaintiffs' expert determined that AWL placed approximately 19,093,285 calls to 2,286,545 unique cell phone numbers it obtained through the Website. Ex. H (Hansen Rept.), ¶¶ 52-54. Of those 19,093,285 calls, 14,374,977 were "connected calls," meaning they were answered. *Id.*, ¶ 54; Ex. C (Ginther Dep.) at 71:15-72:24. 2,200,380 unique cell phone numbers received calls that were connected. Ex. H (Hansen Rept.), ¶ 54.

## C. Common Evidence Demonstrates that AWL Knew of Its TCPA Violations.

### 1. Attorneys General Complaints and Investigations

AWL has a long history of consumer and state attorney general complaints about its websites and its calling practices. In July 2013, a consumer contacted the New York AG to complain that AWL's website, New-York-Health-Insurance.com, deceived him into providing confidential information and caused him to receive phone calls from AWL. *See* Ex. J (AWL Karpilovsky 0090-0095). The consumer's internet search for New York's official state health insurance exchange website directed him to AWL's lead generation website. Thinking it was an official government website, he provided "personal and medical information about myself and my wife" and then immediately received a phone call from AWL. *Id.* He requested that AWL stop deceptively representing itself in a way that leads consumers to believe it is an official government health entity. Also in July 2013, the Indiana AG forwarded AWL a consumer complaint alleging that AWL was illegally calling consumers on the state Do Not Call list. *See* Ex. K (AWL Karpilovsky 0088). In June 2015, AWL was served with a subpoena in a TCPA lawsuit, *Hossfeld v. GEICO*, 1:14-cv-00876-WDQ (D. Md.), in which a consumer alleged that he was called via an autodialer on his cell phone line. *See* Ex. L (AWL Karpilovsky 8354).

In July 2015, the Pennsylvania AG contacted AWL on behalf of a consumer whose minor daughter was receiving insurance solicitation calls. An insurance provider informed the consumer that AWL sold the teenage daughter's cell phone number to it. The consumer was

- 7 -

"worried for [the minor daughter's] safety, with her personal information being 'sold' to others . . . ."  *See* Ex. M (AWL Karpilovsky 0096-0101).

In September 2015, a consumer contacted AWL to notify it that he had repeatedly received calls to his telephone number, which was listed on the National Do Not Call Registry ([www.donotcall.gov](www.donotcall.gov)), violating the TCPA.  AWL employees dismissively referred to him as an "ambulance chaser" and forwarded his email, characterizing it as a joke.  *See* Ex. N (AWL Karpilovsky 8354) ("Wednesday morning funny…").

In January 2016, Spanish Quotes, Inc. ("Spanish Quotes") demanded that AWL indemnify it in a TCPA lawsuit, *Ken Johansen v. Liberty Mutual Group Inc., et al.*, Case No. 1:15-cv-12920-ADB (D. Mass.).  As grounds for its demand, Spanish Quotes stated that AWL violated the TCPA and engaged in outbound dialing, call transfers, and incentivized calls, all in violation of an agreement between AWL and Spanish Quotes.  *See* Ex. O (AWL Karpilovsky 8354).

In September 2016, the Pennsylvania AG forwarded a consumer complaint related to AWL's unsolicited calling practices, demanding a response from AWL.  The consumer stated that AWL "called repeatedly.  I told them to remove my name and number from their list. I went online to check their number and many people repoted [sic] it as a scam."  Ex. P (AWL Karpilovsky 0079).

In December 2016, AWL received a subpoena from the Kansas AG, seeking information about its business practices related to calling Kansas consumers since August 1, 2013.  Ex. A (AWL Karpilovsky 0054-0060).  AWL responded to that subpoena under oath in February 2017.  *See id.* (AWL Karpilovsky 0061-0069).

In fall 2017, the Indiana AG again investigated AWL, this time for calling consumers

without their consent in violation of the Indiana Do Not Call law. *See* Ex. Q (AWL Karpilovsky 0078). According to an October 3, 2017 letter, the AG closed its file but reserved its rights to renew the investigation and/or file an enforcement action against AWL. *Id.*

### 2. AWL's Lack of TCPA Compliance

Yet, despite years of attorney general and consumer complaints, AWL has not taken steps to comply with the TCPA. To the contrary, AWL has known for many years that it was not TCPA compliant. For example, on March 27-28, 2014, AWL Director of Online Operations Darin Ginther sent emails to a third-party sales manager under the subject line "TCPA compliance" admitting that he had not inquired about "TCPA compliant solutions." Ex. R (AWL Karpilovsky 8354). In that same email, Ginther noted that a large insurance carrier "would not do business" with AWL's call center "until we resolve this issue." *Id.*

AWL's failure to take any action to comply with the TCPA may derive from its mistaken belief that it was exempt from the TCPA's prohibition on calling consumers on cell phones. *See id.* (D. Ginther email: "All of our consumers are opt-in, so the cell phone restrictions don't apply."). Therefore, even though AWL's own documents indicated that AWL could only place calls to persons who provided "unambiguous prior express written consent to deliver . . . an auto-dialed or pre-recorded telemarketing call to a cell phone" in "a signed written agreement" that "clearly and conspicuously discloses" the authorization the consumer is making, *id.*, AWL did not institute procedures to comply with the TCPA.

### D. Common Evidence Shows an Absence of Prior Express Written Consent.

Common—what this Court characterized as "uniform"—evidence will demonstrate whether AWL can meet its burden of showing that it called class members with their prior express written consent. AWL will likely argue that the miniscule language below the "Submit" button on the Website demonstrates that it called consumers with their prior express consent. It

is undisputed that AWL used the *same* Lilliputian language, displayed the same way (hidden beneath the "Submit" button), for *every* class member.  *See* Ex. B (Leirer Dep.) at 45:21-23; Ex. G (Young Rept.) at 8 (confirming that AWL's internal changelog was consistent with Ms. Leirer's testimony and "no changes affected the placement of the contested language below the 'Submit' button").[5]

Further, AWL *knew* that this language did not constitute effective prior express written consent.  LeadiD, a company selling TCPA compliance software and auditing services, informed AWL in 2013 that under the new October 2013 FCC rule change the website disclosure should be "visible to the consumer."  Ex. S (AWL Karpilovsky 8354).  LeadiD provided a sample consent disclosure with a checkbox whereby a consumer "proactively" demonstrates that he or she consents to being contacted on a cell phone.  *Id.*  The disclosure language "should be placed on the form page before the user is required to submit their personal information."  *Id.*  AWL CEO Bill Daniel knew about LeadiD TCPA compliance software since at least July 2, 2013.  *See* Ex. T (AWL Karpilovsky 8354).

LeadiD provided a Venable whitepaper to AWL which confirmed that AWL's purported consent language was legally ineffective.  *See* Ex. S (AWL Karpilovsky 8354).  According to the whitepaper:

> There are likely many different ways to comply with the new rule, but each variation will require some explicit language ***placed where it will be readily apparent to the consumer*** (i.e., directly on a registration or sign-up page), and is ***not buried among other disclosures or difficult to identify among the rest of the copy on the screen***.

*Id.* (emphasis added).  AWL manager Erik Josowitz dismissively referred to the LeadiD TCPA

---

[5] Other than a couple of minor, irrelevant changes, the Website has remained the same throughout the class period.  Ex. B (Leirer Dep.) at 52:25-53:11; *see also* Ex. G (Young Rept.) at 7-8 (concluding after reviewing the Website's design "changelog" that "the Website was not modified in any material way").

compliance service as a "CYA deal," stating that AWL was more interested in using LeadiD to vet leads that it obtained from third parties, not its own outgoing calls.  Ex. U (AWL Karpilovsky 8354).

LeadsCouncil, an industry group to which AWL belongs, says that prior express written consent "must be in writing.  If there's no written proof of consent, you'll be in trouble if a consumer decides to take legal action."  https://www.leadscouncil.org/3-things-lead-generators-need-to-do-to-be-tcpa-compliant/.  It recommends the use of a service that issues consent-verification certificates for each lead form.  *Id.*  "These certificates record user data input, including mouse movements and clicks, as well as confirm the presence of consent language on forms."  *Id.*  Despite these warnings, AWL does not obtain written proof of consumers' consent.

AWL received complaints about its so-called consent language from business partners who did not believe that AWL's language constituted effective prior express written consent.  On April 16, 2014, an AWL national account manager forwarded a question from a business partner and asked another AWL employee to "confirm we are TCPA compliant and or validate why we would not need a check box for consumer consent?"  Ex. V (AWL Karpilovsky 8354).  An employee included on the exchange noted that it would probably be ignored internally.  *See* Ex. W (AWL Karpilovsky 8354) ("not sure she's going to get an answer this way").

AWL also had its leads rejected by at least one insurance company because it could not document effective prior express written consent.  In a November 18, 2013 email, Plymouth Rock informed AWL that it would not do business with AWL until AWL changes its online forms to be compliant with LeadiD's verification system, meaning the forms must "document that the specified TCPA disclosures were provided to and consent obtained from the consumer during the lead event prior to the information being submitted."  Ex. X (AWL Karpilovsky

8354); *see also* Ex. Y (AWL Karpilovsky 8354) (March 31, 2014 email: "We have one particularly large carrier that won't do business with our call center until we resolve this issue.").

AWL knows how to make a consumer use a checkbox verification form but chooses not to do so in its lead acquisition business. This is presumably because checkbox verification negatively impacts "conversion rate optimization," the process by which companies like AWL "try and find impediments to their ability to convert" website visitors into leads. Ex. Z (Excerpts from Dec. 14, 2017 Deposition of Alexander Young) at 34:2-4. Companies "want nothing to be in the way of someone giving you information and clicking a submit button." *Id.* at 300:6-11. And a checkbox verification system (known as CAPTCHA) "gets in the way of that line between arriving at the page, the initial view, filling out the information and hitting the submit button." *Id.* AWL does use CAPTCHA verification, however, on the form consumers must fill out to add themselves to AWL's internal Do Not Contact list. *See* Ex. AA (AWL Karpilovsky 0008)(CAPTCHA). Therefore, AWL makes it much harder for consumers to *purge* their information from AWL's autodialer than it does for consumers to unwittingly provide their cell numbers to AWL's autodialer in the first place.

### E.     Background of Plaintiffs' Claims

#### 1.     Plaintiff Jimmie Criollo

Plaintiff Jimmie Criollo is a single father who lives in San Antonio, Texas. Ex. E (Criollo Dep.) at 5:19-20, 19:2-6, 76:9-10. He must administer medicine to his daughter to address ongoing health problems related to her cancer treatment. *Id.* In late 2016, Criollo began searching for new health insurance for himself and his family. *Id.* at 75:3-19. He went online and looked at a website he thought was the official "Obamacare" website. *Id.* at 53:16-23. In fact, it was actually AWL's "Affordable Health Insurance Plans" Website, which looked very similar to the Obamacare website. *Id.* Criollo entered his ZIP code, cell phone number, and

other personal information into the Website and clicked "Submit" to receive online health insurance quotes to review and compare. *See* Ex. BB (Plaintiff Criollo's Interrogatory Responses) at 9. He did not and could not see the miniscule language hidden below the "Submit" button purporting to authorize AWL both to call him on his cell phone and sell his phone number to eight AWL insurance customers. Ex. E (Criollo Dep.) at 58:20-59:7. After submitting his personal information, he did not receive any insurance quotes, either on the website or via email. *Id*. at 68:16-69:25. Instead, he received a phone call from an AWL representative. *Id.* 99:1-25. Criollo told AWL he was not interested in talking further or purchasing health insurance. *Id.* After this time, Criollo received frequent calls on his cell phone from unrecognized numbers around the country—calls he had not received before AWL captured and presumably resold his cell phone number. *Id*. at 111:10-112:16. These calls frustrated and annoyed him, tied up his phone line, used his minutes, and interrupted him while he administered medicine to his daughter fighting cancer. *Id*. at 18:18-19:25, 93:23-94:16.

### 2. Plaintiff John Karpilovsky

John Karpilovsky works for a health care company as an information technology specialist. Ex. F (Karpilovsky Dep.) at 13:11-23. He went to the Website in June 2017 seeking health insurance. *Id*. at 61:17-24. The Website gave consumers like him the expectation that they would receive an e-mail with links or health insurance quotes, and a description of health insurance options. *Id.* at 18:21-19:2, 122:2-16. He did not and could not see the miniscule language hidden below the "Submit" button purporting to authorize AWL both to call him on his cell phone and sell his phone number to up to eight insurance customers for the same purpose. *Id*. at 17:23-19:16, 103:23-104:1. After Karpilovsky entered the required information on the Website, he immediately received a phone call from AWL. *Id.* at 20:3-21:6. He informed AWL that he was not interested in purchasing insurance. *Id*. at 22:12-23:8. Immediately thereafter,

and continuing into the following day, he received regular, repeated phone calls from unrecognized numbers seeking to sell him insurance based on information he had provided through AWL's Website. *Id.* at 21:8-23:8. The calls he received cost him phone minutes and caused him inconvenience. *Id.* at 140:24-142:13.

## III.   <u>LEGAL STANDARD</u>

Class certification is proper if Plaintiffs satisfy the requirements of Rule 23(a) and Rule 23(b)(3). The purpose of Rule 23 is to provide for the efficient administration of justice by allowing claims involving the same core issues to proceed in the aggregate. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); Wright, *et al.*, 7A *Fed. Practice & Proc.* § 1751 (3d ed. 2010) ("Class actions serve an important function in our system of civil justice.").

Consumer protection cases, like this one under the TCPA, which arise from a single course of conduct that affects large numbers of consumers, are particularly amenable to class treatment. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Accordingly, "[c]lass certification is normal in litigation under [the TCPA]." *Turza,* 728 F.3d at 684; *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674 (S.D. Fla. 2013) (certifying TCPA class); *Chapman*, 2014 WL 540250, at *15, n. 11 (discussing "the many cases decided during and since 2011 in which TCPA classes have been certified, as well as the Seventh Circuit's observation in *Turza* that class certification is the norm in TCPA cases").

The Court has broad discretion in making class certification decisions. *Ervin v. OS Restaurant Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011). The court's "rigorous analysis" of Rule 23 prerequisites may entail some overlap with the merits of the plaintiff's underlying claim, but "the court should not turn the class certification proceedings into a dress rehearsal for a trial on the merits." *Kleen Products LLC v. Int'l Paper,* 306 F.R.D. 585, 589 (N.D. Ill. 2015) (Leinenweber, J.) (quoting *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th

Cir. 2012)). "Instead, the Court need only consider the evidence submitted by the parties and determine whether Plaintiffs have proven each of Rule 23's elements by a preponderance of the evidence." *Id.* A court will certify an ascertainable class where the Plaintiffs have standing and the Rule 23 factors are met. *See, e.g.*, *Kohen v. Pacific Inv. Mgmt. Co., LLC,* 571 F.3d 672, 676 (7th Cir. 2009) ("as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied."); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015) (discussing ascertainability requirement). "A class action is the efficient procedure for litigation" of a case where one defendant "imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013).

## IV. ARGUMENT

### A. The Proposed Class

Plaintiffs seek certification of one class (the "Class") under Rule 23(b)(3):

> From the time period of February 21, 2013 through the present (the "Class Period"), all persons within the United States who received a "connected call"[6] from All Web Leads, or any party acting on its behalf, to a cellular telephone through the use of an automated telephone dialing system after their contact information was submitted via an insurance quote form on All Web Leads' website www.affordable-health-insurance-plans.org.

### B. Plaintiffs Have Standing.

It is undisputed that Plaintiffs received calls on their cell phones from AWL. Plaintiffs allege that those calls violated the TCPA, which provides for statutory damages to the call recipient. As such, Plaintiffs have properly alleged: (1) an injury-in-fact (the invasion of privacy caused by the unwanted calls); (2) stemming from the defendant's unlawful conduct (the telemarketing calls in violation of the TCPA); and (3) that the injury may be redressed (via the

---

[6] "Connected calls" are those calls identified by Plaintiffs' expert under Section II(B)(4).

statutory TCPA damages).  A violation of the TCPA is a concrete injury.  *Barrera v. Guaranteed Rate, Inc.*, Case No. 17-cv-5668, 2017 WL 4837597, at *3 (N.D. Ill. Oct. 23, 2017) (holding that such an "injury falls squarely within the body of cases where courts have found sufficient injury to meet the injury requirement to bring a TCPA claim," and collecting cases) (citation omitted); *see also Pierre v. Midland Credit Mgmt., Inc.*, Case No. 16 C 2895, 2017 WL 1427070, at *4 (N.D. Ill. Apr. 21, 2017) (Leinenweber, J.) (statutory violation was sufficient injury to meet standing requirement for class certification).  Accordingly, as recipients of unwanted telemarketing calls, Plaintiffs have standing to assert their claims and represent the Class.  *See id.*

## C.      The Proposed Class Is Ascertainable.

"Rule 23 requires that a class be defined, and experience has led courts to require that classes be defined clearly and based on objective criteria."  *Mullins*, 795 F.3d at 659.  In *Mullins*, the Seventh Circuit explained that ascertainability is only focused on the class definition itself, explicitly rejecting the application of a "heightened" or "stringent" version of ascertainability in which courts consider administrative feasibility.  *Id.*  "A court need not ascertain 'absent class members' actual identities . . . before a class can be certified.'"  *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014) (quoting *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012).  "Rather, '[i]t is enough that the class be ascertainable,' with class members to be identified during a claims administration process if the class prevails."  *Id.*

The Class consists only of individuals who received calls made by AWL during the Class Period marketing AWL's health insurance services.  It is comprised of "a particular group, harmed during a particular time frame, in a particular location, in a particular way," and thus avoids the problem of a vague class definition.  *See Mullins*, 795 F.3d at 660.  These elements can be evaluated based entirely on objective criteria.  As such, the proposed class is

ascertainable.  *See, e.g., Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 227 (N.D. Ill. 2016) (observing in a TCPA case that "class membership is as objective as it comes" and "easily ascertainable" in light of "the Seventh Circuit's disavowal of the heightened ascertainability requirement adopted by some other circuits"); *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007, 1018 (N.D. Ill. 2017) (noting that "the Seventh Circuit has rejected any more stringent a requirement" for ascertainability).

The Class is not only ascertainable, but comprehensively identified through AWL's records.  Plaintiffs' expert, using call data obtained from AWL, identified the persons who comprise the Class.  This showing more than satisfies the ascertainability requirements of Rule 23.  *Cf. Birchmeier*, 302 F.R.D. at 248 (N.D. Ill. 2014)*,* (holding that list of 930,000 phone numbers established a "sufficiently ascertainable" TCPA telemarketing class); *see also Pierre*, 2017 WL 1427070, at *5 ("the parties can ascertain class members via ministerial inspection" of defendant's records).

### D. The Requirements of Rule23(a) Are Met.

The Class satisfies each of the Rule 23(a) requirements.

#### 1. The Class Is Sufficiently Numerous.

A class is numerous if it is large enough "that joinder of all parties is impractical."  Fed. R. Civ. P. 23(a)(1).  In the TCPA context, "[a] class of forty generally satisfies the numerosity requirement."  *See Savanna Group, Inc. v. Trynex, Inc.,* No. 10–cv–7995, 2013 WL 66181, *4 (N.D. Ill. Jan. 4, 2013).  AWL's records show approximately 19 million calls to 2 million unique cell phone numbers.  This is more than sufficient to satisfy numerosity.

#### 2. The Proposed Class Involves Common Issues of Law and Fact.

Commonality is satisfied where common questions are capable of generating "common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (citation omitted).

"[F]or purposes of Rule 23(a)(2) even a single common question will do."  *Id.* at 2556; *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (same); *see also Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003) (commonality threshold is "not high").  Because, by definition, calling programs are carried out on a mass basis, a proposed TCPA class often contains common issues of law and fact.  *See G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009) (collecting cases).

The same is true here.  All of the calls to the Class were made: (1) by AWL's dialers (2) to cell phone numbers (3) obtained by AWL through the same procedure on the Website—issues of fact capable of proof by evidence common to every class member.  There simply are no unique or individualized issues.

Similarly, AWL's affirmative defense that it called Class members with their prior express consent is uniquely susceptible to class-wide resolution, as this Court already found:

> [Plaintiff] seeks to represent a class of individuals each of whom engaged in the same consent procedure that he did—filling out the quote form, clicking "Submit," and then receiving an autodialed cell phone call. Thus, absent some other interface with All Web, each putative class member gave the same consent; the ability of All Web to invoke consent as an affirmative defense to each class member is uniform; and determining the legal efficacy of this consent under the TCPA "will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Sullivan*, 2017 WL 2378079, at *9 (quoting *Dukes*, 564 U.S. at 350).  Discovery has confirmed that AWL's prior express consent affirmative defense is uniform to all Class members: either AWL's Lilliputian language constituted "clear and conspicuous" prior express written consent and complied with the TCPA, or it didn't.  Finally, whether AWL's calls constitute "willful" or "knowing" violations of the TCPA is a legal issue capable of classwide determination.[7]

---

[7] Should liability be found, damages are simply basic math: in light of the statutory damages provisions of the TCPA, damages can be calculated on a classwide basis simply by multiplying the number of calls

*Footnote continued on next page*

Given these common issues, Plaintiffs have articulated a "common nucleus of operative fact" that links all Class members' claims together. *See Savanna Group,* 2013 WL 66181, at *8; *see also Pierre,* 2017 WL 1427070, at *7 (finding commonality met where determination of the statutory violation involved a "standard form letter" that applied across all class members). The proposed classes therefore satisfy commonality.

### 3. Plaintiffs' Claims Are Typical.

"Rule 23(a) further requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Spates v. Roadrunner Transp. Sys., Inc.*, Case No. 15 C 8723, 2016 WL 7426134, at *2 (N.D. Ill. Dec. 23, 2016) (Leinenweber, J.). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and…[the] claims are based on the same legal theory." *Id.* (quoting *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006)). Put differently, where the defendant engages "in a standardized course of conduct vis-a-vis the class members, and plaintiffs' alleged injury arises out of that conduct," typicality is "generally met." *Hinman v. M and M Rental Center*, 545 F. Supp. 2d 802, 806-07 (N.D. Ill. 2008) (citing, *e.g.*, *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)). "This requirement 'directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large.'" *Birchmeier,* 302 F.R.D. at 251 (quoting *Muro v. Target Corp.,* 580 F.3d 485, 492 (7th Cir. 2009)).

Here, the standardized course of conduct consists of (1) AWL making automated calls to cell phones in violation of the TCPA; and (2) AWL displaying a miniscule statement below the "Submit" button on its Website that, it contends, constitutes effective prior express written

---

*Footnote continued from previous page*
received by the statutory penalty. *Cf. Carriuolo*, 823 F.3d at 988 (holding that even "individualized damages calculations are insufficient to foreclose the possibility of class certification").

consent for TCPA purposes for *all* such calls.  Plaintiffs, like everyone in the Class, clicked a

button on the Website and received calls on their cell phones during the Class Period.  Their

claims thus flow from the same conduct that produced the calls and purported prior express

written consent for all the other members of the Class, and are therefore typical of them.  *See*

*Savanna Group,* WL 66181, at *11 (typicality met in TCPA case where "the putative class

members' claims also arise from the same legal theory"); *see also Pierre,* 2017 WL 1427070, at

*8 (typicality met where plaintiff and class members all received the same "standardized

letter[s]").  Rule 23(a)(3) is satisfied.

### 4.  Plaintiffs and their Counsel Are Adequate.

"Rule 23(a)(4) requires that the named plaintiffs and class counsel 'will fairly and

adequately protect the interests of the class.'"  *Birchmeier,* 302 F.R.D. at 252 (quoting the Rule).

Courts have rejected proposed class representatives due to "conflicts of interest" or "serious

credibility problems."  *Birchmeier,* 302 F.R.D. at 252 (internal quotation marks and citations

omitted).  Here, Plaintiffs have no interests that are antagonistic to the Class, and there is no

indication of any credibility or other problems with any proposed class representative.  Ex. E

(Criollo Dep.) at 25:25-26:4; 33:19-23; Ex. F (Karpilovsky Dep.) at 41:6-44:5.  Plaintiffs have

committed to achieving the best result for all members of the Class, and have received no money

or other compensation in return for serving as a class representative.  Their interests are aligned

precisely with those of the class.[7]

### E.  The Rule 23(b)(3) Requirements Are Satisfied.

Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or

fact common to the class members predominate over any questions affecting only individual

---

[7] Pursuant to the 2003 amendments to Rule 23, the qualifications of Plaintiffs' counsel are assessed under
subsection (g) of the rule, and therefore are addressed below.  *See infra* Sec. V.

members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the particular controversy." *Birchmeier,* 302 F.R.D. at 252, 255 (quoting the rule) (internal quotation marks omitted). Here, common questions predominate over individual issues and the class action device is superior to other methods of adjudication.

### 1.    **Common Issues Predominate.**

Predominance is "readily met" in certain consumer cases. *Amchem*, 521 U.S. at 625. The touchstone for predominance analysis in the Seventh Circuit is efficiency. *Butler v. Sears, Roebuck and Co.,* 702 F.3d 359, 362 (7th Cir. 2012) ("*Butler I*"), *vac'd on other grounds*, 133 S. Ct. 2768 (2013), *judgment reinstated*, 727 F.3d 796 (7th Cir. 2013) ("*Butler II*"), *cert. denied*, 134 S. Ct. 1277 (2014). "[T]he requirement of predominance is not satisfied if 'individual questions . . . overwhelm questions common to the class.'" *Butler II,* 727 F.3d at 801 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1196 (2013)). On the flip side, it is not the case that *every* issue must be common to *every* class member, as "a rule requiring 100% commonality would eviscerate" consumer class actions. *Suchanek v. Strum Foods, Inc.,* 764 F.3d 750, 759 (7th Cir. 2014). "[P]redominance is [not] determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Butler II*, 727 F.3d at 801. "An issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Id.* (quoting *Dukes*, 131 S. Ct. at 2551); *accord Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 444 (7th Cir. 2015).

In addition, while Rule 23(b)(3) requires a showing that *questions* common to the class predominate, it does not require proof that those questions will be answered, on the merits, *in favor of* the class. *Amgen*, 133 S. Ct. at 1191. "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication

of the controversy 'fairly and efficiently.'" *Id.* Whether or not this case is ultimately decided in favor of the Class, its resolution will be determined by answering a binary question common to all Class members: either AWL's Website language constituted legal consent within the meaning of the TCPA or it did not.

Plaintiffs do not anticipate *any* individualized issue that Defendants could raise, let alone enough of them to justify a decision not to certify a class. This is true for several reasons.

First, in some TCPA cases courts have found that the question of prior express consent is an individualized issue that defeats the predominance requirement where evidence relating to consent varies across the class. *E.g., Balschmiter v. TD Auto Finance, LLC,* 303 F.R.D. 508, 527-29 (E.D. Wisc. 2014). Here, though, AWL's ability to demonstrate that it received Class members' prior express written consent before calling them is itself a classwide issue that only *strengthens* the case for certification. *Sullivan*, 2017 WL 2378079, at *9 (observing, in this case, that each class member "engaged in the same consent procedure that [the proposed class representative] did"). As this Court found and discovery has confirmed, "each putative class member gave the same consent; the ability of All Web to invoke consent as an affirmative defense to each class member is uniform; and determining the legal efficacy of this consent under the TCPA 'will resolve an issue that is central to the validity of each one of the claims in one stroke.' " *Id.* AWL will attempt to meet its burden by demonstrating that the language on its Website constituted prior express written consent as to all Class members as a matter of law— a question uniquely suitable for classwide relief.

The remaining issues in this litigation are likewise questions that can only be resolved on a classwide basis. AWL's calling software either was or was not an autodialer. And AWL either did or did not have notice of its noncompliance with the TCPA when making autodialed calls to

cell phone numbers.  Like the question of prior express written consent, these are binary

questions: AWL either is, or is not, liable for placing millions of calls to Class members in

violation of the TCPA.  The answer will not—cannot—vary Class member to Class member.

"Because the central issue in this case involves [defendant's] standardized course of conduct

directed to each class member," any individualized issues, if there even are any, are

overwhelmed by common questions.  *Pierre*, 2017 WL 1427070, at *9. The predominance

portion of Rule 23(b)(3) is satisfied.

### 2.     A Class Action Is Superior to any Alternatives.

The second prong of Rule 23(b)(3) requires a finding that "a class action is superior to

other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P.

23(b)(3); Fed. R. Civ. P. 1 (noting that the Rules "should be construed and administered to

secure the just, speedy, and inexpensive determination of every action and proceeding").  "Class

certification is usually considered a superior method of adjudicating claims involving

standardized conduct, even if there are individual issues that exist among class members (for

example, on questions such as damages) . . . ." *Cicilline v. Jewel Food Stores, Inc.,* 542 F. Supp.

2d 831, 838 (N.D. Ill. 2008).  Where there is a "breadth and importance of the common issues"

in the case, "'the superiority requirement . . . poses no serious obstacle to class certification.'"

*Int'l Paper,* 306 F.R.D. at 606 (quoting *Messner,* 669 F.3d at 814 n.5).

Unsurprisingly, courts routinely find class actions to be the superior method of

adjudicating TCPA claims.  *See, e.g.*, *Hinman,* 545 F. Supp. 2d at 807 ("It also appears that

resolution of the issues on a classwide basis, rather than in thousands of individual lawsuits

(which in fact may never be brought because of their relatively small individual value), would be

an efficient use of both judicial and party resources."); *Reliable Money Order, Inc. v. McKnight*

*Sales Co., Inc.,* 281 F.R.D. 327, 339 (E.D. Wis. 2012) ("Providing evidence of the defendant's

alleged violation of the TCPA, as it relates to this specific class, would be duplicated in each individual lawsuit if the action were not allowed to proceed as a class. This runs counter to the objective of class actions to provide efficiency for the parties and the courts.").  As one federal court recently found while certifying a TCPA case:

> Jurists and commentators have long debated the merits of the modern class action and the public policies behind Rule 23…. It is the view of this Court that the instant case highlights one of the strongest justifications for the class action device: its regulatory function…. A statute such as the TCPA, which provides for a relatively small recovery for individual violations but is designed to deter conduct directed against a large number of individuals, can be effectively enforced only if consumers have available a mechanism that makes it economically feasible to bring their claims. Without the prospect of a class action suit, corporations balancing the costs and benefits of violating the TCPA are unlikely to be deterred because individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute.

*Bee, Denning, Inc. v. Capital Alliance Group*, 310 F.R.D. 614, 630 (S.D. Cal. 2015).  Forcing individual Class members to fund and undergo lengthy, invasive discovery efforts in individual proceedings would not be superior to class treatment.

Moreover, this case does not present any of the manageability problems that impact the superiority determination.  In particular, providing notice to Class members—which occasionally proves an obstacle to class certification under the TCPA—can be easily accomplished in this case because Plaintiffs will be able to generate an accurate list of Class members using the records obtained in discovery.  *See Mullins*, 795 F.3d at 667 (holding that questions related to the accuracy and usability of proposed class lists should be analyzed in the context of the superiority requirement); Ex. H (Hansen Rept.), ¶ 56 (expert can obtain a Class list for any set of dates in the data provided by AWL).  AWL's outbound dialing lists include contact information (name, address and telephone number) for each of the Class members AWL called during the Class Period.  As such, Plaintiffs already possess a list of Class members, and should the Court certify

the proposed Class, notice could quickly and efficiently be sent to Class members using that list. Thus, the proposed Class meets the superiority requirement of Rule 23(b)(3).

## V.    APPOINTMENT OF CLASS COUNSEL

Plaintiffs request that their counsel be appointed as Class Counsel for this action. Fed. R. Civ. P. 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and instructs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class."

LCHB and Kozonis Law are "qualified, experienced, and generally able to conduct the proposed litigation." Counsel are experienced class action practitioners, fully versed in the intricacies of class actions in general and TCPA class actions in particular. Selbin Decl., ¶¶ 2-17; Klinger Decl., ¶¶ 2-5. Counsel have litigated and resolved dozens of similar TCPA cases, including three of the four largest cash settlements in the 24-year history of the TCPA, and been appointed to lead many such cases in this District. *Id.* Accordingly, Plaintiffs ask that their counsel be appointed co-lead class counsel on behalf of any class that is certified.

## VI.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed Class against AWL under Rule 23(b)(3).

1491314.4

Dated: January 12, 2018

Respectfully submitted,

LIEFF CABRASER HEIMANN &
 BERNSTEIN, LLP

By: */s/ Jonathan D. Selbin*

Jonathan D. Selbin
(admitted to the N.D. Ill. general bar)
Email: jselbin@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Daniel M. Hutchinson
(admitted to the N.D. Ill. general bar)
Email: dhutchinson@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

John T. Sragens
Email: jspragens@lchb.com
(admitted to the N.D. Ill. general bar)
222 2nd Avenue South, Suite 1640
Nashville, TN 37210
Telephone: (615) 313-9000
Facsimile: (615) 313-1973

Gary M. Klinger (ARDC # 6303726)
Ryan F. Sullivan (ARDC # 6314103)
KOZONIS LAW, LTD.
4849 N. Milwaukee Ave., Ste. 300
Chicago, Illinois 60630
Phone: 773.545.9607
Fax: 773.496.8617
gklinger@kozonislaw.com
rsullivan@kozonislaw.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/John T. Spragens*

1491314.4